MERTON L. BROWN, Receiver of Underwriters Finance Corporation,

*vs.*

INSURANCE EQUITIES CORPORATION, a corporation of the State of Delaware.

*New Castle, July* 11, 1936

*James M. Malloy,* of Wilmington, and *Randolph Hicks,* of the firm of Satterlee & Canfield, of New York City, for petitioner.

*John Biggs, Jr.,* of the firm of Biggs, Biggs & Lynch, of Wilmington, and *Herbert S. Avery,* of the firm of Avery, Dooley, Post & Carroll, of Boston, Mass., for receivers.

THE CHANCELLOR: Solicitors for the receivers are in disagreement as to the merit of the grounds of opposition to the prayers of the petition. Mr. Biggs frankly stated to the court that he considered there is no valid defense to the petition. Mr. Avery is of a contrary opinion and has accordingly filed a brief in opposition to the petition.

1. One point made in opposition is that the Circuit Court of St. Louis had no jurisdiction to enter the decree authorizing a sale of Missouri State Life assets to the petitioner. The decree of that court has never been appealed from. It stands to date as a final decree. If the court had no jurisdiction to entertain the suit, neither the full faith and credit clause of the Constitution of the United States (*Article* 4, § 1) nor the Act of Congress passed in pursuance thereof (28 *U. S. C. A.* § 687), requires that the courts of another state accord it recognition. *Lutz v. Roberts Cotton Oil Co.,* 3 *Boyce* (26 *Del.*) 227, 82 *A.* 601; *Mitchell v. Garrett,* 5 *Houst.* 34. That the Circuit Court of St. Louis had jurisdiction over the subject matter of the suit before it and of the parties, is not denied. The lack of the court's jurisdiction to order the sale is said to be revealed on the face of the pleadings in that a necessary fact which under the Missouri statute was required to be alleged by the Superintendent of Insurance in his petition to the Circuit

Court, was not alleged. The court, however, in its decree found that the fact existed. The only thing, therefore, that can be said against the validity of the decree is that the Circuit Court of St. Louis committed an error in making a finding of fact on the state of the pleadings. It is not for this or any other court, except it be a reviewing tribunal in the State of Missouri, to sit in review of the alleged errors of the court which rendered the decree in question. The full faith and credit clause is not concerned with mere irregularities and errors. 34 *C. J., p.* 1151. The petitioner is entitled to all the benefits of the decree authorizing the sale to it of the notes in question.

2. It is next urged and argued at length that the notes were given without any consideration moving to the maker and that at most they were given as a mere accommodation for the benefit of Missouri State Life Insurance Company which acquired them from the payee bank. The use which the argument of the objecting solicitor makes of these alleged facts is one that I find it unnecessary to enlarge upon. The argument is an elaborate one and the evidence is voluminous in its details, dealing with a multitude of transactions, negotiations and inter-corporate relations which in my view of the case are utterly irrelevant to the controversy in hand.

The foundation on which the argument under this head of the case is erected is the conception that the insolvent, when it gave the notes, received no considration therefor, and did so purely by way of accommodation to Missouri State Life Insurance Company.

Whether the argument which is made to flow from those facts as its source be sound or not, I do not pause to examine. This is for the reason that the evidence convinces me that not only are the alleged facts which are the starting point of the argument not demonstrated but the contrary is shown to have existed.

This is what the evidence demonstrates. The insolvent was desirous of purchasing 37,385 shares of Kentucky

Home Life stock, the same being about seventy-five per cent. of the total outstanding. It already owned twenty-five per cent. of Kentucky Home Life stock. That company appears to have been in a key position of control over, though not a majority owner of Missouri State Life Insurance Company. Purchase of seventy-five per cent. of Kentucky Home Life stock would make the insolvent sole owner of that company and through it, the dominant influence in Missouri State Life Insurance Company. Now Missouri State Life Insurance Company was desirous of having the insolvent acquire the Kentucky company because the insolvent had agreed with other stockholders of Missouri State Life to cause the Kentucky company to join them in forming a voting trust of a majority of the stock of Missouri State Life and thereby bring stability to the Missouri State Life's management and free it from the injury which previous struggles for control had inflicted upon it.

The purchase price was $1,350,000.00. The insolvent had available for the purchase ready funds of $550,000.00. It needed to borrow $800,000.00. It made application to the First National Bank of St. Louis for a loan. The officers of Missouri State Life, because of their desire to see the voting trust arrangement accomplished, lent their efforts in aid of the insolvent in the loan negotiation, holding out the representation to the bank that in due course Missouri State Life would take over the notes from the bank. The loan was made in the full face amount of the notes, and the stock of Kentucky Home Life was purchased by the insolvent.

The transaction of purchase, the borrowing of the money and the execution of the notes with collateral attached were duly authorized by the unanimous vote of the insolvent's board of directors.

It is not contended that the insolvent was induced by fraud of any kind to enter upon the plan of purchasing the stock. The idea of doing so originated with itself. Its corporate purposes appear to have been to secure holdings in insurance companies. The Kentucky Home Life transac-

tion was the approach for it to a practical control of Missouri State Life. I cannot discover any ground whatever for the belief that the transaction was in accommodation of Missouri State Life except in the sense that insofar as it was calculated to bring peace and quiet to the affairs of that corporation, it was benefited thereby. But that benefit was also the individual desideratum of the insolvent as the dominant stockholder of Missouri State Life. There was no accommodation to Missouri State Life in the financial or loan sense. It did not receive the stock that the insolvent bought. That stock was delivered to the insolvent for and on its own account as the owner.

From the foregoing statement of facts it is obvious that the notes were not given without consideration. The consideration was $800,000.00.

Much emphasis has been laid upon the contention that the stock which the insolvent bought was not worth the price paid for it by about $650,000.00. This is spoken of as though a fraud had been committed against the insolvent. Certain it is that if any wrong was done to the insolvent by its paying an exaggerated price for the stock, it was not a wrong done by either the lender of the money or the Missouri State Life. It was done by the insolvent's own officers and directors, who not only unanimously approved the purchase but themselves originated it and negotiated the price. The Missouri State Life learned of the proposed transaction from the insolvent's officers after all arrangements for the purchase had been completed, except for the matter of finding someone to lend the money.

It is a new and novel doctrine that a corporation on the unanimous vote of its directors may borrow money from a creditor on its notes, and then repudiate the loan because its officers and directors used the proceeds in making an improvident investment. If those who are authorized to make commitments for a corporation do so in a way that entails a heavy loss upon it, or even do so in a way that works what I may call an internal fraud upon it, innocent

outsiders who dealt with the officers and directors on the faith not only of their apparent but their real authority to speak for it, are not to be penalized because of either the folly or the fraud of the corporation's agents in managing its internal affairs. It it hardly necessary to cite authority in support of that very plain proposition. In principle it is found recognized in *Penington v. Commonwealth Hotel Construction Corp.,* 18 *Del. Ch.* 170, 156 *A.* 259; *New York & N. H. R. Co. v. Schuyler,* 34 *N. Y.* 30; and *Fifth Avenue Bank v. Forty-Second St. & G. St. F. R. Co.,* 137 *N. Y.* 231, 33 *N. E.* 378 19 *L. R. A.* 331, 33 *Am. St. Rep.* 712. The only question open to debate in such cases is the extent of the authority of the individual who assumes to commit the corporation. There can be no question of that kind in this case because it was the directors of the corporation who authorized the borrowing of the money and the execution of the notes.

Relief should be granted as prayed.